◼ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BRUCE SMITH, Appellant. [933 NYS2d 413]—

Spain, J.

On February 16, 2008, police responded to the apartment of Kari Cordato on State Street in the City of Hudson, Columbia County around 1:30 A.M. where they found Floyd Sanders, the victim, on a rear porch adjacent to the kitchen, unconscious and bleeding. Also present were Cordato and her housemate, Kevin Allen, defendant and his wife and several others, all friends; Cordato's five young children were asleep upstairs. The evidence established that sometime before midnight, defendant had confronted Sanders at Sanders' apartment about a handwritten list in which Sanders had reportedly explicitly documented his sexual abuse of many children, naming Cordato's eight-year-old daughter and defendant's 13-year-old stepdaugh-

ter. Defendant punched Sanders in the face several times, and then defendant escorted Sanders down the street to Cordato's apartment, followed minutes later by defendant's wife; Cordato and Allen were shown the list, Cordato recognized the handwriting as that of Sanders and defendant's daughter was summoned from her sleep and questioned about the abuse. Sanders was then severely beaten and died a week later due to blunt force trauma to the head.

Defendant, Cordato and Allen were jointly indicted for manslaughter in the first degree and gang assault in the first degree. Allen was granted a severance and tried separately. After a joint jury trial, defendant was convicted of the lesser included offenses of assault in the second degree and gang assault in the second degree, and now appeals. This Court affirmed Cordato's convictions for gang assault in the first degree and assault in the second degree (*People v Cordato*, 85 AD3d 1304 [2011], *lv denied* 17 NY3d 815 [2011]).

Initially, defendant challenges County Court's ruling, after a *Huntley* hearing, denying his motion to suppress statements he made to police on February 16, 2008. We perceive no grounds for disturbing the court's determination, which has a sound basis in the record. Defendant's initial incriminating statements to police—who had just responded to the potential crime scene in a crowded apartment and were investigating what had transpired—were admissible as noncustodial responses to brief, investigatory questions aimed at clarifying the situation (*see People v Steinhilber*, 48 AD3d 958, 959 [2008], *lv denied* 10 NY3d 871 [2008]; *see also People v Cordato*, 85 AD3d at 1309). The *Huntley* testimony established that defendant approached Officer Nicholas Pierro and asked to speak with him; the officer asked, "what's up[?]" and, in response, defendant said, referring to Sanders, "this guy is raping my daughter and [Cordato's] daughter." The officer replied that they could "handle that later" but "need[ed] to know what happened to the guy on the back porch." Defendant stated, "I did it. I beat his ass," and the officer asked, "you're the one that beat him up[?]" and defendant replied, "yes, that a\*\*hole is raping little kids." These statements, made around 1:35 A.M., were voluntary and noncustodial and no *Miranda* warnings were required.

Defendant was arrested shortly thereafter and taken to the police department where Pierro provided *Miranda* warnings around 1:59 A.M., which defendant indicated he understood, agreeing to speak with him. Pierro advised Detective James Delaney of the foregoing and, around 3:03 A.M., Delaney approached defendant, handcuffed in a holding cell, and said, "we

need to talk about what happened to these kids"; defendant replied, "you don't understand, that's my 13-year-old daughter. I have to protect my family." Around 3:30 A.M., defendant blurted out to Delaney from the holding cell remarks indicating his sense of unfairness that he should be going to jail for protecting his family. When Delaney asked defendant for his pants, shoes and socks for analysis, defendant remarked, "I could have saved you some trouble and bodied him right there. He's lucky I didn't." Defendant remained in continuous custody and was not subject to coercive tactics in the short delay after he was advised of and waived his rights. Delaney was not required to advise him of his *Miranda* rights a second time, given Pierro's recent advisement and defendant's voluntary waiver thereof (*see People v Carelli*, 41 AD3d 1092, 1093 [2007]). Further, the 3:30 A.M. statements were not the product of police questioning but, rather, were spontaneously uttered and, as such, admissible (*see People v Smith*, 21 AD3d 587, 588 [2005], *lv denied* 5 NY3d 833 [2005]). While the officers detected the odor of alcohol on defendant's breath, their testimony undermined any claim that defendant was so intoxicated as to have been incapable of understanding or voluntarily waiving his rights (*see People v Meissler*, 305 AD2d 724, 726 [2003], *lv denied* 100 NY2d 644 [2003]).

At around 10:00 A.M., Detective John Funk provided defendant with *Miranda* warnings a second time, which defendant again waived, indicating that he wanted to be "straight" with police. Defendant then provided a narrative statement, recorded by Delaney, of the events of the prior night, admitting that he had hit Sanders at Sanders' apartment after seeing the list; defendant stated that after he escorted Sanders to Cordato's apartment and showed everyone the list, "I kept going at him and wanted him to tell me the truth. [Sanders] kept lying to me. I lost my temper. It stopped when [another friend present] broke it up and the police got there." Defendant also admitted, "I didn't want it to go this far. I just wanted him to learn a lesson." Despite defendant's contention that his written statement was involuntarily obtained, the testimony fully supports County Court's conclusion that he was re-Mirandized and voluntarily, knowingly and intelligently waived his rights and provided, and signed around 11:20 A.M., the written account of the assault (*see People v Judware*, 75 AD3d 841, 843-844 [2010], *lv denied* 15 NY3d 853 [2010]). There was no evidence that defendant was threatened or coerced, asked for an attorney or objected to the questioning, or that the length or circumstances of the questioning rendered his responses involuntary (*id.* at 844). Thus, de-

fendant's statements properly were ruled to be admissible in their entirety.*

Next, we reject defendant's challenges to the legal sufficiency and weight of the evidence. Assault in the second degree required that defendant, "[w]ith intent to cause serious physical injury to another person, [caused] such injury to such person or to a third person" (Penal Law § 120.05 [1]). The jury was charged that defendant could be found criminally liable for the assault as an accomplice, i.e., if he acted with the mental culpability required for the assault and "solicit[ed], request[ed], command[ed], importune[d], or intentionally aid[ed] [another] person to engage in such conduct" and such other person "engage[d] in conduct which constitute[d] [that] offense" (Penal Law § 20.00). Gang assault in the second degree required that defendant, acting with the intent to cause physical injury to another person, "cause[d] serious physical injury to such person or to a third person" while "aided by two or more persons actually present" (Penal Law § 120.06).

The People pursued the theory at trial that the assault on Sanders was an ongoing incident that started at Sanders' apartment and continued at Cordato's apartment. Indeed, the indictment, and later the jury instruction containing the lesser included offenses of which defendant was convicted, charged that all of the offenses occurred "on or about the 16th of February, 2008, in the City of Hudson," and the charges were never limited to one apartment or the other.

Turning to the offenses, there was certainly a "valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime[s]" of conviction (*People v Bleakley*, 69 NY2d 490, 495 [1987] [citation omitted]). There was no dispute that defendant assaulted Sanders at Sanders' apartment, punching him in the face several times, and then escorted him to Cordato's apartment to expose the list and confront him in the presence of their friends, believing Cordato's young child was named on the list. It was also established that defendant was present in Cordato's apartment

---

* Likewise, we discern no basis for disturbing County Court's determinations to credit the officers' testimony why defendant was not asked to sign a *Miranda* waiver card, that the CPL 710.30 notice for defendant's 3:30 A.M. oral statements inadvertently indicated that they were made in response to police questioning rather than correctly noted as spontaneous, and that defendant's interrogations were not videotaped because the equipment malfunctioned.

when Sanders was beaten by more than one among them. While defendant's wife denied seeing him ever actually strike Sanders at Cordato's place, her testimony—like Cordato's—placed defendant standing in the kitchen with Allen and others at a critical time, i.e., when Sanders was confronted with the list and after Cordato's daughter was summoned and questioned, when Allen and then Cordato hit Sanders. Defendant's wife testified that she left the kitchen to go upstairs and speak with the child and, when she returned to the kitchen, Sanders was on the floor in a pool of blood with Allen. While she testified that defendant was taken into the living room by another friend, her testimony cannot be read to exclude defendant's presence in the kitchen during the beating of Sanders. Cordato gave a similar account, but testified that, after her daughter was questioned, she left the kitchen to vomit and, upon her return, Sanders was on the bloody floor and surrounded by defendant, Allen and two other friends. Notably, the jury did not need to unanimously agree on whether defendant participated as a principal or as an accomplice (*see People v Mateo*, 2 NY3d 383, 406 [2004], *cert denied* 542 US 946 [2004]). The foregoing, combined with defendant's many admissions to police, viewed most favorably to the People, proved beyond a reasonable doubt that defendant, acting with the requisite intent to cause serious physical injury, actually perpetrated an assault on Sanders at both apartments or was criminally liable for the assault at Cordato's apartment as an accessory having importuned or intentionally aided in the assaults.

Similarly, with regard to the gang assault in the second degree conviction, viewing the evidence in a light most favorable to the People, including defendant's statements to police, the jurors rationally concluded that defendant acted with the mental culpability required—intent to cause physical injury—causing serious physical injury to Sanders "when aided by two or more other persons actually present" (Penal Law § 120.06; *see People v Sanchez*, 13 NY3d 554, 563-567 [2009]; *People v Cordato*, 85 AD3d at 1310). There was proof that Cordato, Allen and at least two other friends were actually present and "in the immediate vicinity of the crime and . . . capable of rendering immediate assistance" (*People v Rivera*, 71 AD3d 701, 702 [2010]; *see People v Marquez*, 298 AD2d 407, 407-408 [2002], *lv denied* 99 NY2d 560 [2002]), and the testimony established that others actually aided· the assault. There is no dispute that Sanders, who died a week later from his head injuries, suffered "serious physical injury" (Penal Law § 10.00 [10]), and defendant's intent and motives were overwhelmingly established by his conduct and admissions to police. The evidence that defendant was one of

the group who assaulted Sanders included his own admissions, the testimony establishing his presence in the kitchen for at least some of the time interval in which the assault occurred, and the evidence establishing that Sanders' blood was on defendant's hand and shoes.

Further, viewing the evidence in a neutral light, while a different verdict would arguably not have been unreasonable, we do not find that the jury's verdict is contrary to the weight of credible evidence (*see People v Bleakley*, 69 NY2d at 495). While defendant's wife and Cordato, his good friend, had obvious motives not to implicate him directly in the fatal beating, the testimony and proof were uncontroverted that defendant actually assaulted Sanders at Sanders' apartment and then initiated the group confrontation at Cordato's apartment. Defendant's own statements to police persuasively established that he actively participated in the beating at Cordato's apartment that led to Sanders' death, and the requirement that he was aided by two or more others—actively or capable of assisting—was convincingly proved. Thus, the verdict will stand.

Defendant continues to claim that he was entitled to a separate trial from that of Cordato, a point unsuccessfully made prior to trial and repeatedly raised and reconsidered at trial. We find the argument to be meritless for the reasons stated in Cordato's appeal (*People v Cordato*, 85 AD3d at 1308-1309). At trial, defendant, like Cordato, denied participating in or observing the assault on Sanders at Cordato's apartment, both sought to repudiate their admissions to police, and defendant denied causing serious physical injury to Sanders at Sanders' apartment; Cordato's written statement to police was redacted to remove any reference to defendant (*id.* at 1308, 1308 n 2). Their defenses were not in "irreconcilable conflict" (*People v Mahboubian*, 74 NY2d 174, 184 [1989]), and no abuse of discretion occurred by the denial of defendant's severance motions.

To the extent that defendant asserts that County Court erred in denying his motion to set aside the verdict as repugnant (*see* CPL 330.30 [1]), we disagree. Defendant's motion, not made until after the discharge of the jury, was untimely and, as such, "the issue was not preserved for appellate review as a question of law, a condition precedent to the grant of a motion made pursuant to CPL 330.30 (1)" (*People v Guerrero*, 111 AD2d 350, 355 [1985, Titone, J., dissenting], *revd on dissenting mem below* 69 NY2d 628 [1986]; *see People v Carter*, 63 NY2d 530, 536 [1984]). Given that the motion was made after the discharge of the jury, when "it was no longer possible to remedy the defect, if any, by resubmission to the jury for reconsideration of its

verdicts" (*People v Satloff*, 56 NY2d 745, 746 [1982]), the court correctly denied this relief (*see People v Alfaro*, 66 NY2d 985, 987 [1985]; *People v Jones*, 79 AD3d 1244, 1245 n [2010], *lv denied* 16 NY3d 832 [2011]). We decline to take corrective action in the interest of justice (*see People v Johnson*, 40 AD3d 1270, 1273 [2007], *lv denied* 9 NY3d 877 [2007]).

Finally, we are not persuaded to exercise our interest of justice jurisdiction to reduce defendant's sentence (*see* CPL 470.15 [6] [b]). While defendant received the maximum aggregate sentence of 15 years in prison, as a second felony offender, the evidence demonstrated that he, in contrast to Cordato, initiated the highly-charged and ultimately fatal group confrontation of Sanders. While defendant's predicate felony was a relatively low level drug possession in 2004, his only known crime, he was on parole at the time of this violent incident and we do not find that the sentence was "a clear abuse of discretion or the existence of extraordinary circumstances" warranting a discretionary reduction (*People v Elliot*, 57 AD3d 1095, 1097 [2008], *lv denied* 12 NY3d 783 [2009] [internal quotation marks omitted]).

Mercure, J.P., Malone Jr., Kavanagh and McCarthy, JJ., concur. Ordered that the judgment is affirmed.