■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TREVOR WALKER, Appellant. [627 NYS2d 404] —Appeal by the defendant from a judgment of the Supreme Court, Queens County (Demakos, J.), rendered August 12, 1993, convicting him of attempted murder in the second degree (two counts), assault in the first degree (two counts), reckless endangerment in the first degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is affirmed.

The defendant contends that the People failed to prove his guilt beyond a reasonable doubt because the testimony of the eyewitness was incredible as a matter of law. However, viewing the evidence in the light most favorable to the prosecution *(see, People v Contes,* 60 NY2d 620), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. The eyewitness unequivocally maintained throughout her testimony that she had observed the defendant and his codefendant shoot the victims. While there were some inconsistencies in her testimony, those inconsistencies "related primarily to tangential matters and did not render her testimony incredible as a matter of law" *(People v Lawrence,* 179 AD2d 682, 683; *see also, People v Braithwaite,* 188 AD2d 388; *People v Castro,* 174 AD2d 378; *People v Maisonet,* 172 AD2d 274).

Moreover, the evidence that the eyewitness was a former drug addict, that she had a criminal record, and that she did not identify the defendant and his codefendant as the shooters until a day or two after the shooting, was before the jury for its consideration and did not render her testimony incredible as a matter of law *(see, People v Walker,* 185 AD2d 867; *People v Jenkins,* 174 AD2d 379; *People v Henry,* 151 AD2d 501; *People v Sutton,* 108 AD2d 942).

It is well settled that resolutions of issues of credibility, as well as the weight to be accorded to the evidence presented, are primarily questions to be determined by the jury, which saw and heard the witnesses *(see, People v Gaimari,* 176 NY

84, 94). Its determination should be accorded great weight on appeal and should not be disturbed unless it is clearly unsupported by the record (see, People v Garafolo, 44 AD2d 86, 88). Upon the exercise of our factual review power, we are satisfied that the verdict of guilt was not against the weight of the evidence (see, CPL 470.15 [5]).

The defendant's contention that he was prejudiced by the prosecutor's summation is largely unpreserved for appellate review (see, CPL 470.05 [2]). In any event, we find that the prosecutor's summation did not deprive the defendant of a fair trial (see, People v Roopchand, 107 AD2d 35, affd 65 NY2d 837). Balletta, J. P., Copertino and Altman, JJ., concur.

Goldstein, J., dissents and votes to reverse the judgment, on the law and as a matter of discretion in the interest of justice, and to order a new trial, with the following memorandum: In this case, the victims claimed they were unable to identify the defendant and his codefendant. One of the victims told the defendant's attorney prior to the trial that the defendant had not shot him. At the trial, he declared that he and the defendant were still friends.

The sole witness to connect the defendant and his codefendant to the crime was a sister of one of the victims, who was admittedly a former crack-cocaine addict, with prior convictions for prostitution and attempted sale of drugs. The witness had known the defendant and his codefendant for years. Her testimony was fraught with inconsistencies.

Before the Grand Jury, she had testified that the codefendant was carrying a "double-barrel" gun, while at the trial, she could not recall so testifying, and described the gun as six-inches long, "clipped at the bottom". Before the Grand Jury, she described the codefendant as having a scar on the right side of his nose, but at the trial, she acknowledged that that portion of her description was incorrect.

At the trial, she claimed that when she first saw the defendant, her niece noted that "there was an incident that happened earlier between one of my brother's friends and [the defendant's] friend". Nevertheless, even though she saw her brother standing in the immediate area, she allegedly watched the armed defendant, the codefendant, and other companions for eight minutes, and did not call out to warn her brother until after the shooting started. Thereafter, she acknowledged that she was not sure "how many minutes" elapsed.

Before the Grand Jury, she claimed she was "right behind" the defendant and his codefendant when they started shoot-

ing, and then "crawled back" to her building. At the trial, she could not recall that testimony.

Shortly after she witnessed the shooting, the witness telephoned her father from a telephone booth. She claimed that, while in the telephone booth, she noticed the defendant and his codefendant standing nearby, inches away. Although she had just observed the defendant and his codefendant shoot her brother, she remained in the telephone booth, and placed a call to her father, "paying them no mind". Before the Grand Jury, she had testified that, while in the telephone booth, she overheard the defendant say "let's get them", but at the trial she denied that she heard the defendant say anything. However, at the trial she claimed she heard the codefendant say "I know I got one of them". She acknowledged that she delayed identifying the defendant and his codefendant to the police until detectives visited her apartment a day or two after the crime.

During summation, the prosecutor commented, over objection, that the crime occurred in a "housing project" where "[p]eople in this area * * * are subject to shootings almost everyday. And when they get these shootings, they don't run to the police to tell what happened * * * They fear for their own safety".

The prosecutor further argued that the witness who identified the defendant and his codefendant "is the only one honest enough and brave enough to come in and tell you her own brother * * * was shot". With respect to the brother, the prosecutor speculated that "He will take care of it if he wants to later. He's not going to take care of it here in a court of law". The prosecutor urged the jury "not to let his attitude affect you * * * Don't let [the defendants] get away with this again". The codefendant's objections to these comments were sustained.

Nevertheless, the prosecutor persisted, commenting that another witness, whom the People did not call to testify at trial, did not testify because: "If [one of the victims] couldn't come here and tell you what happened, do you think she is going to be able to come in here and tell you what happened". The codefendant's objection to this comment was also sustained.

The prosecutor's comments implied that only one witness identified the defendant because the other witnesses were intimidated by the defendant and his codefendant. The prosecutor also impressed upon the jury that its duty was to ensure

that the defendant and his codefendant did not "get away with this again". These comments were clearly improper *(see, People v Trinidad,* 59 NY2d 820; *People v Johnson,* 196 AD2d 449; *People v Lozada,* 104 AD2d 663; *People v Fogel,* 97 AD2d 445; *People v McLeod,* 84 AD2d 794). In light of the closeness of the case, the errors cannot be deemed harmless. Further, although the defendant and his codefendant did not request curative instructions or move for a mistrial after the codefendant's objections were sustained, reversal is warranted in the interest of justice.